THE HONORABLE RICARDO S. MARTINEZ

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>ABDUL QASIM RAY ZAHIR,<br>Defendant. | No. CR22-144-RSM<br><br>DEFENSE SENTENCING MEMORANDUM |

## I. INTRODUCTION

Abdul Qasim Zahir asks this Court to sentence him to 24 months on count one and 120 months on count two for a total of 12 years in custody. While below the Guideline range for his offenses, this is a substantial sentence that will give him the opportunity to engage in meaningful rehabilitation while he is in custody. Because he is ineligible for First Step Act credits, this sentence also contemplates his proven and impressive dedication to engaging in programming despite the lack of any benefit.[1] For the past four years, Mr. Zahir has been in pretrial detention at FDC SeaTac. He has spent that time connected to his family and, impressively, participating in and completing multiple FSA eligible programs.

---

[1] If Mr. Zahir was eligible for FSA credits, he could earn up to 12 months off his sentence, in addition to the standard good-time credits. The defense requested sentence is, in essence, what Mr. Zahir would serve on a 15-year sentence if he were eligible for FSA.



**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

Mr. Zahir also asks this Court to recommend that the BOP apply a "management variable", that would allow him to be housed in a low or medium security facility where he would have substantially more access to treatment, programs, and training. *See* Fed. Bureau of Prisons, U.S. Dep't of Just., No. 5100.08, *Inmate Security Designation and Custody Classification* Chapter 5, Page 1, (May 6, 2026), https://www.bop.gov/policy/progstat/5100_008_cn-3.pdf [https://perma.cc/7YX7-PUPS]. Being designated to a United States Penitentiary, as discussed herein, is likely to derail all the progress that Mr. Zahir has made in the last four years and will prevent him from moving forward upon release.

Mr. Zahir will eventually reenter society. He asks this Court to give him a sentence that will support successful reentry, rather than repeating the same patterns that have failed Mr. Zahir and his community in the past. In Mr. Zahir's own words, "I know that federal supervision is a struggle for me, but I think that all of what I'm doing inside will help when I get out." Ex. 1 (Letter to Court of A. Qasim Zahir).

## II. HISTORY AND CHARACTERISTICS OF ABDUL QASIM "Q" ZAHIR[2]

Abdul Qasim Zahir was raised in prisons. His educators were prison guards, prison administrators, volunteers and other inmates. But even before his first institutionalization at 15 years old, he had family members who acted as his guardians, his tormentors, and his tutors. These were men whose own education and developmental skills



[2] The defense has provided the Court with a lengthy and comprehensive evaluation of Mr. Zahir prepared by Dr. Mark D. Cunningham. Ex. 2 (filed under seal). Because this exhibit and the PSR prepared in this case contain many of the details relevant to this section, defense counsel has limited the information included in this section and incorporates Ex. 2 herein.



**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

had been similarly earned in prisons and institutions.

They introduced him to drugs and alcohol, which he was using by the age of ten. PSR ¶ 89. They taught him how to get high with items around the house. And they used him as entertainment and a pawn in their own criminal activities. Mr. Zahir never had a chance. Born premature, his childhood was marked by physical abuse and multiple head injuries. His family history is replete with alcohol and drug related issues, multiple deaths by gun violence, and physical and emotional abuse. Ex 2 at 33–34. Mr. Zahir was the target of his parents' verbal abuse which often centered around his stupidity and uselessness. *Id.* He was attacked and beaten throughout his childhood by multiple family members and peers. His ACES score is 9 out of 10. He estimates being hit in the head so hard that he lost consciousness at least three times before the age of 14. By the time he was in elementary school, he was using inhalants and experimenting with "pass-out" games—repeatedly denying his brain oxygen during a crucial period of brain development. Ex. 2 at 19 (noting the multiple head injuries and other factors impact cognitive functioning and that "[i]ntellectual disability may arise from a constellation of risk factors operating singly or in combination."). An SUD evaluation from when he was 16 years old noted that he had already completed a youth treatment program but never engaged in aftercare or relapse prevention programs. The records from his interactions with the juvenile criminal system show similar patterns—an initial resistance to treatment and programming, eventual engagement and meaningful participation, then complete derailment as soon as he returned to the community. This pattern is understandable when viewed in the context of Mr. Zahir's biological and environmental developmental and cognitive challenges. *See* Ex. 2, Findings 1–5.





**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

Mr. Zahir did poorly in school and was diagnosed with ADHD at an early age. A review of the available school records indicates that the adults involved in his schooling moved him on each year although his grades did not support such acceleration. Ex. 2 at 33 ("Neither [parent] assisted Qasim with his homework and neither attempted to provide supervision and guidance of him. Qasim was functionally emancipated as a young teenager" and experienced multiple periods of homelessness). In middle school, he was expelled for marijuana possession and then attended an alternative school when he was not in custody. He barely passed any classes and failed most. Nonetheless, Mr. Zahir was able to get his GED while he was incarcerated as a juvenile. His traffic safety instructor even described him as a "pleasure to have in class."

TECH ED
LVIAN STUDENT WAS A PLEASURE TO HAVE IN CLASS
TRAFFIC SAFETY
STUDENT RECEIVED .25 CREDIT
A

Besides an auto mechanics class, also taken while in juvenile prison, this is the only "A" grade that Mr. Zahir received in any class.

It is unsurprising that Mr. Zahir has been diagnosed as a person with intellectual disability. Ex. 2 at 1–2. It is unfortunate that this diagnosis came after years of struggling with the basic foundational needs of daily life. And it is tragic that it came long after any services or assistance could have made Mr. Zahir's life easier and more manageable. For example, Mr. Zahir has never prepared himself a cooked meal. He is capable of making things in the microwave because that is usually the only cooking tool available to him in custody. He cannot manage a calendar and infrequently knows what the date is. He cannot make change at a store. He cannot pass a written test to get his license. From the age of 15 onward, he was either being directed what to do and how to do it in custodial settings or was being assisted by his family to sustain his basic needs.



**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

Mr. Zahir is intensely loyal to his family and they return this love. Ex. 3 at 1–4 (Letters of Jamila Zahir and Tamur Zahir). They know him as a protector and as a kind-hearted person who goes out of his way to help others. *Id.* Despite the fact that he has been absent from monumental events that have impacted their family, they do not think of him as estranged or distant. Mr. Zahir's mother died while he was in custody at FDC SeaTac and his family recorded the entire funeral to make sure that he would be able to watch it someday and feel like he was there in spirit if not in person.





When Mr. Zahir found himself back in federal prison, he could feel himself reverting to the fight or flight mode he had survived in for more than a decade in a United States Penitentiary. Although he had been in local and county custody for periods before he was brought into federal custody, it was the reentry back into the federal system that set his nervous system entirely on edge. The hypervigilance and fear that accompanied being back in federal custody took hold of him. Within the first few months of returning to federal custody, Mr. Zahir had a single disciplinary incident. PSR ¶ 9.

And then, as he promised his family and his defense team, that was it. Mr. Zahir began requesting books, despite his difficulty reading. He engaged in genuine philosophical conversations about being in custody, the politics and rules of custodial



**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

settings and how he interacted with them. And, against all odds, Mr. Zahir was able to get a job in the FDC kitchen. Then, even more surprisingly, he began engaging in and completing programs while on pretrial status. Ex. 4 (Certificates). His father visited him regularly. And for more than four years, while he has served his time in pretrial custody at FDC SeaTac, he has done everything in his power to show that he is not simply getting through his time in custody, he is using it to better himself. *See* Prob. Recommendation at 6 ("Given the limited availability of programming offered in his current custodial setting, this is a considerable success, and commendable on the part of Mr. Zahir."); *United States v. Thompson*, 315 F.3d 1071, 1077 (9th Cir. 2002) (recognizing that post-offense rehabilitation could be grounds for a departure even under the mandatory Guideline scheme); *United States v. Lizarraras-Chacon*, 14 F.4th 961, 967 (9th Cir. 2021) (acknowledging same under statutory sentencing factors).

Most of Mr. Zahir's life has been spent in custody. And he knows he will spend at least another decade in custody for this offense. But he has decided that it is not the place he lives that will define his life, but rather what he does with it. Mr. Zahir has begun sharing hopes and dreams for his future with his family and case team. This was not something he was capable of doing previously when his focus was solely on how to survive another lengthy prison sentence.

## III. GUIDELINES

The defense agrees with Probation's calculation of the Guidelines. Mr. Zahir knows that he is asking for a sentence below the Guideline range, but this variance is warranted by his extraordinary acceptance of responsibility, his post-offense rehabilitation, and the mitigating facts presented to the Court.



**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

## IV. NATURE AND CIRCUMSTANCES OF THE OFFENSE: MR. ZAHIR INSTINCTIVELY REACTED TO A PERCIEVED THREAT TO HIS COUSIN WHEN HE SHOT THE VICTIM.

Mr. Zahir agrees he committed a terrible crime worthy of a serious punishment. He does not claim the shooting was justified and proportional to the threat to his cousin he perceived in the moment. His judgement was impaired by the drugs he had taken, his cognitive deficiencies, assumptions he made about C., and the brutal violence he has witnessed almost daily within institutional settings and his own family.

The government argues, in part, that Mr. Zahir should be given a sentence at the high-end of the guideline because he was allowed to plead guilty to Manslaughter rather than the more serious offense of Murder in the Second Degree. The government's argument in this regard should be rejected because the facts and circumstances indicate that Mr. Zahir did not act with the intention of killing C.; he acted with the intent of protecting his cousin. This does not excuse his conduct. But it does mitigate against a high-end sentence.

After being arrested in August of 2020 on two different charges, Mr. Zahir spent a short period of time in King County custody. He was released on an ankle monitor after medical tests showed that he was in medical distress and his liver and kidneys were close to failure. Upon his release, he was successfully treated and spent some time recovering. Then, in part because of the precautions being taken because of COVID-19, Mr. Zahir remained out on an ankle monitor until he was arrested by Tulalip police on the instant charge.

After receiving medical treatment, Mr. Zahir relapsed and fell back into a criminal lifestyle. He was certain he was going back to prison for the robbery he'd been arrested for and could not find motivation or incentive to stay sober. He devolved quickly and was out of control. His friend, C., was part of that lifestyle. Mr. Zahir allowed C. to stay with him at his parents' home. They worked together on a car in his



**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

parents' garage. They were both interested in car mechanics and getting high. Mr. Zahir was using more than five different drugs daily. Ex. 2 at 38–39. On the night of the shooting, he, C., and the other people in the garage were passing around fentanyl, methamphetamine, and marijuana. He had used multiple other drugs in the hours preceding the shooting. *Id.* at 42–43.

As Dr. Cunningham notes in his report, by the time Mr. Zahir ended up in that garage, he had personally experienced the violent murders of multiple people. *Id.* at 36. At age 16, he witnessed a close friend being shot in front of him at a party. *Id.* at 37. He knew more than seven people who were part of his family, extended family, or close peer group that had been murdered before he turned 18 years old. *Id.* His closest friend while he was in a USP had been beaten to death. *Id.* He had witnessed violent assaults "at every federal prison he was in." *Id.* By the time he was in that garage, on May 28, 2022, his exposure to extreme violence, in combination with his other "deficiencies and dysfunctions" had created the "template[] for personal vulnerability and enhanced expectations of violence from others." *Id.* at 36. Mr. Zahir has *never* lived in an environment an average person would consider "safe." He has never been given the opportunity to value his own life as deeply as others value him. He has lived every day of his adult life believing his own survival was fleeting and entirely outside of his control.

When Mr. Zahir saw C. screaming at his cousin, calling her a "fucking bitch," and walking toward her in an "angry manner" (PSR ¶ 17), he believed that C. was going to physically attack her. He knew C. had a power tool in his hand and that there were guns and gun parts all over the garage. He did not have a rational response, but he had one that was built on the altercations and conflict he had experienced and witnessed throughout his life. In most of the environments that Mr. Zahir had lived in, stepping up to anyone in the manner that C. did was not something that could be backed down from.



**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

He instinctively reacted by firing rapid shots at C. His response was a product of his "neurodevelopmental impairments . . . chronic substance dependence . . . reduced cognitive capability and [a lack of] psychological resources to critically examine or reality-test" the situation. Ex. 2 at 36. He reacted to what he perceived was a true threat to his cousin and shot C. As he told her later, he was not going to let anyone hurt her. PSR ¶ 17.

Mr. Zahir's description of his relationship with C. is telling. He explained to Dr. Cunningham that he had let C. move in after C. fought with his son's partner and was asked to leave their home. Ex. 2 at 45. He explained that they "'had normal arguments—like you get in with a *celly*' but 'got along real good.'" *Id.* (emphasis added). The only context that Mr. Zahir could initially use for his relationship with C. was as a cellmate. Not a roommate or a sibling or a friend, but a cellmate. He described the violent rhetoric he had heard C. using and an act of violence he had observed in the weeks before the shooting. On May 28, 2022, Mr. Zahir lived in the world and the mind space that he had become trapped in while he was in custody. He was hypervigilant, reactive, and afraid. All of this was exacerbated by the excessive amount of drugs that he and C. had been using continuously through their months of living together and by Mr. Zahir's preexisting cognitive deficiencies and challenges.

Mr. Zahir greatly regrets his actions. As he notes in his letter to the Court "I want to apologize first to C.'s family and friends. He was a dear friend to me and no matter what he had going on, I let him stay with me." Ex. 1. He has spent his years in pretrial custody analyzing his own actions on that night and their result. He shot and killed his friend. He shot his friend because he thought he was protecting his cousin. And now, both of them are dead[3] and he will spend another decade or more of his life in

[3] His cousin, Gina, was killed in a hit and run incident while Mr. Zahir was in custody for this offense.



**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

prison. Mr. Zahir has spent the last four years assessing the horrible choice he made that night and doing the necessary work to lay a foundation from which his decisions will no longer come from a place of fear and reactivity.

## V. PUNISHMENT, DETERRENCE, RESPECT FOR THE LAW, AND PROTECTION OF SOCIETY

Every sentencing recommendation being made to this Court will result in Mr. Zahir spending more than a decade in custody. This will certainly punish him. It will also protect society for the period of time he is incarcerated. But this is not what will protect society in the long term. The recommendations made by all the parties will provide sufficient punishment and deterrence. But this cannot be the only consideration for the Court.

## VI. REHABILITATION, TREATMENT AND TRANSITION BACK TO SOCIETY

This Court can consider Mr. Zahir's demonstrated commitment to rehabilitation in granting him a variance from the Guideline range in this case. *Lizarraras-Chacon*, 14 F.4th at 967. Mr. Zahir's determination to participate in programming has been extraordinary. Pretrial detainees almost never get permission or priority to participate in programming at FDC SeaTac. However, Mr. Zahir's patience and resolve have paid off, and he has completed four FSA approved programs, including the Non-Residential Drug Treatment program, an Anger Management program, a House of Healing program, and a "MoneySmart" program.

Dr. Cunningham suggests that because of Mr. Zahir's "susceptibility to influence—institutional, peer, or otherwise—he may have difficulty succeeding in a higher security prison . . .." Ex. 2 at 47.



**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**





This suggestion is borne out of past experience. Before Mr. Zahir was sentenced to federal prison, he had some tattoos. Most were homages to his Native American heritage. But his most jarring tattoos were inked in federal prison. Some he got after he was jumped multiple times by both other inmates and the guards at the prison. Another is the slang used to refer to the Native American clique in USP Pollock—"Savages." Ex. 2 at 14–15. Mr. Zahir was unable to contemplate the impact these tattoos would have when he was released. His thinking was short-term and reactionary, responding only to the environment he was in and not capable of imagining any other life for himself.

Mr. Zahir was 20 years old when he was sent to USP Pollock in 2007. That year the prison was the "leader in prisoner-on-prisoner homicides . . ."[4] a statistic that included six inmate deaths in 2007. Mr. Zahir's second year at the facility did not start well either, another inmate was stabbed to death in January of 2008. *Id.* USP Pollock's reputation did not get better during Mr. Zahir's time there. In 2018, two years after Mr. Zahir was released from federal custody after his first federal sentence, Louisiana senators sent a letter to the Trump administration begging for funding to fully staff the

[4] Brandon Sample, *Violence on the Rise in BOP Facilities*, Prison Legal News (August 15, 2009) https://www.prisonlegalnews.org/news/2009/aug/15/violence-on-the-rise-in-bop-facilities/ [https://perma.cc/ES87-SPDR



**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

prison, citing the rampant and never ceasing violence and dangerous conditions.[5] Stories of correctional officers at this facility encouraging inmate violence as a method of control are common. While the deaths of inmates or assaults on correctional officers make the news, the daily assaults do not. Being jumped with makeshift weapons and brutally beaten by employees of the prison were accepted consequences of being designated to this facility. Ex. 2 at 14.

Mr. Zahir's experiences, mindset and conduct at USP Pollock is starkly different than his behavior since he has been in custody at FDC SeaTac. Dr. Cunningham remarks that his behavior while in custody at the FDC "suggests that, despite the limitations of his surroundings, Qasim can foster the skills needed on the long climb of his rehabilitation." Ex. 2 at 47. This is why the defense asks that the Court recommend that the BOP apply a management variable that will allow Mr. Zahir to be designated to a medium or low security facility, where he will have more access to the types of programs and custodial jobs that have been so meaningful for him while at the FDC.

## VII. CONCLUSION

When visiting Mr. Zahir, it is not unusual to hear about an experience where he successfully deescalated a conflict on his unit, rather than jumping in or engaging in the usual prison politics. He was particularly proud of a conversation he had with a young

---

[5] *Cassidy, Kennedy, Abraham, Johnson Urge Trump Administration to Increase Staff at Federal Prison Facilities in Louisiana*, Bill Cassidy, M.D. (June 8, 2018), https://www.cassidy.senate.gov/newsroom/press-releases/cassidy-kennedy-abraham-johnson-urge-trump-administration-to-increase-staff-at-federal-prison-facilities-in-louisiana/ [https://perma.cc/JLJ9-TMZ7] ("USP Pollock is the one of the most dangerous facilities in the nation, and there have been many acts of violence involving inmates, including against staff. This facility needs more staffing for the safety of everyone, including inmates and visitors . . .. At the Federal Correctional Complex in Pollock, inmate-on-staff assaults have been severe. Staff have been stabbed, beaten, and bitten. Some staff suffered brain damage, and some required reconstructive surgery from fractured facial bones and stab wounds. Just recently, six staff required treatment at a hospital after being assaulted by inmates using the ubiquitous K2 drug.").



**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

first-time inmate who had been encouraged to assault another inmate. Drawing on his own experiences and their negative consequences, he was able to convince this young man not to act on these demands and helped him figure out a way to keep himself safe while refusing to harm another inmate.

It may be tempting for the Court to dismiss this about-face as opportunistic. It is not. Mr. Zahir has never been secretive about his motivations—his previous commitment to a criminal lifestyle and prison politics is tattooed on his face. Mr. Zahir "cannot go back in time but [] can push forward for [himself] and C." Ex. 1. He asks this Court to give him a sentence that will allow him to do this and to honor the memory of both C. and his cousin, Gina. This has been his motivation for the last four years. If given the opportunity, he will continue to build this foundation from within the Bureau of Prisons to ensure that when he is released he is not just older, but also wiser and more capable of maintaining pro-social behavior with the support of United States Probation, treatment providers, and his community.

Mr. Zahir asks the Court to sentence him to a total term of 12 years in custody and to recommend that he be considered for a management variable, designating to a medium or low security facility.

DATED this 11th day of September 2026.

Respectfully submitted,

s/ *Sara Brin*
s/ *Dennis P. Carroll*
Assistant Federal Public Defenders
Attorneys for Abdul Qasim Ray Zahir



**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**